No. 25-14173

# In the United States Court of Appeals for the Eleventh Circuit

SDP Enterprises, LLC and
Christopher Andrew Yarborough,
*Plaintiffs-Appellees,*

v.

ARDN Development, LLC and
Judy Ard Belk,
*Defendants-Appellants,*

On Appeal from the United States District Court
for the Southern District of Alabama, No. 1:25-cv-375-KD-MU
The Honorable **Kristi K. DuBose**, District Judge, Presiding.

## PRINCIPAL BRIEF OF DEFENDANTS-APPELLANTS ARDN DEVELOPMENT, LLC & JUDY ARD BELK


Benjamin C. Fultz
Philip E. Cecil
Robert E. Ranney
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, KY 40202
Phone: (502) 588-2000
Email: bfultz@fmdlegal.com
pcecil@fmdlegal.com
rranney@fmdlegal.com

Allen E. "Teeto" Graham
PHELPS DUNBAR LLP
101 Dauphin Street, Suite 1000
P.O. Box 2727
Mobile, Alabama 36652
Phone: (251) 441-8233
Email: teeto.graham@phelps.com

*Counsel for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants ARDN Development, LLC and Judy Ard Belk ("Appellants") welcome oral argument in this matter because it presents several complicated legal issues, including:

1. comity concerns between state and federal courts and the principal purpose of diversity jurisdiction;
2. application of the Federal Arbitration Act ("FAA") when a district court is asked by opposing parties to compel arbitration of a single dispute under one of two arbitration provisions appearing in two different agreements; and
3. whether the presence of a valid delegation clause in one of those two agreements impacts the district court's authority to decide arbitrability under either agreement.

## TABLE OF CONTENTS


Statement Regarding Oral Argument .................................................................i

Table of Contents.........................................................................................ii

Table of Citations.........................................................................................v

Statement of Subject-Matter and Appellate Jurisdiction ........................................xi

Statement of the Issues ...............................................................................xiv

Statement of the Case ...................................................................................1

I. Course of Proceedings and Dispositions in the Court Below ....................1

II. Statement of the Facts ..............................................................................6

III. Standard of Review ................................................................................14

Summary of Argument ..................................................................................15

Argument......................................................................................................18

I. The district court erred when it denied Appellants' motion to compel arbitration under the QSL II Agreement. .............................................20

a. The district court erred when it undermined the "basic rationale" for diversity jurisdiction by (admittedly) ignoring binding Alabama law to reach a different decision on the merits than an Alabama state court would have. .........................................................................20

b. Even if binding Alabama law does not control (it does), the district court nonetheless erred by finding that Appellees are not bound by the QSL II Agreement's arbitration clause simply because they did not sign the document. ........ 27

i. Appellees are third-party beneficiaries of the QSL II Agreement. ........ 28

ii. Appellees are further equitably estopped by their prior reliance on the QSL II Agreement's arbitration provision. ...... 35

II. The district court erred when it granted Appellees' motion for specific performance and compelled arbitration under the QSL I Agreement. .... 37

a. The district court erred when it construed the scope of the QSL I Agreement's arbitration provision, an issue of substantive arbitrability reserved for decision by an arbitrator under the QSL II Agreement's delegation clause. ........ 37

b. If the QSL II Agreement's delegation clause does not apply, the district court nonetheless erred when it construed the scope of the QSL I Agreement's arbitration provision to include disputes over whether a voting deadlock exists; that is a "gateway question" of

substantive arbitrability subject to determination by a judge, not an arbitrable claim in and of itself......................................................39

c. If the QSL II Agreement's delegation clause does not apply, on *de novo* review, this Court should find that no vote occurred and, thus, that no voting deadlock exists sufficient to warrant arbitration under the QSL I Agreement. ..................................................................42

Conclusion..........................................................................................45

Certificates of Compliance................................................................47

Certificate of Service .......................................................................48

## TABLE OF CITATIONS

**Cases:**

* *Anderton v. The Practice-Monroeville, P.C.*,

164 So. 3d 1094 (Ala. 2014) .................................................2, 23, 24, 26, 38

* *Arthur Anderson LLP v. Carlisle*,

556 U.S. 624 (2009). ................................................................3, 21, 26, 27

*Bailey v. ERG Enters., L.P.*,

705 F.3d 1311 (11th Cir. 2013). ....................................................................22

*Bazemore v. Jefferson Capital Sys., LLC*,

827 F.3d 1325 (11th Cir. 2016). ............................................................. 44, 45

* *Bd. of Trs. of Univ. of Alabama v. Humana, Inc.*,

No. 2:24-CV-165, 2024 WL 1748434 (N.D. Ala. Apr. 23, 2024) .......18, 23–27

*BG Group, PLC v. Republic of Argentina*,

572 U.S. 25 (2014)..........................................................................................42

*Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*,

116 F.3d 1406 (11th Cir. 1997). ....................................................................22

*Caley v. Gulfstream Aerospace Corp.*,

428 F.3d 1359 (11th Cir. 2005)..................................................................... 21

*Capitol Chevrolet & Imports, Inc. v. Grantham*,

784 So. 2d 285 (Ala. 2000). ........................................................................ 35

*Coinbase, Inc. v. Bielski*,

599 U.S. 736 (2023). ........................................................................ xiii

*Custom Performance, Inc. v. Dawson*,

57 So. 3d 90 (Ala. 2010) ........................................................................ 28, 35, 36

*Dellaccio v. Gov't Blvd. Motors, Inc.*,

No. 15-cv-305-CG-N, 2020 WL 13539219 (S.D. Ala. Nov. 20, 2020) .... 35, 36

*Dunning v. New England Life Ins. Co.*,

890 So. 2d 92 (Ala. 2003) ........................................................................ 28, 34, 35

*Entrekin v. Internal Med. Associates of Dothan, P.A.*,

689 F.3d 1248 (11th Cir. 2012). ........................................................................ 21

*Fielder v. Lee Staffing, Inc.*,

No. 2:19-cv-186-MHT, 2019 WL 6359149 (M.D. Ala. Nov. 27, 2019) ... 18, 25

*Georgia Power Co. v. Partin*,

727 So. 2d 2 (Ala. 1998) ........................................................................ 34

*Guaranty Trust Co. of N.Y. v. York*,

326 U.S. 99 (1945). ........................................................................ 21

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,

586 U.S. 63 (2019)........................................................................26, 27

*Hertz Corp. v. Friend*,

559 U.S. 77 (2010)..............................................................................20

*Howsam v. Dean Witter Reynolds, Inc.*,

537 U.S. 79 (2002). ............................................................................41

*In re Checking Acct. Overdraft Litig.*,

754 F.3d 1290 (11th Cir. 2014). ..........................................................14

*John B. Goodman Ltd. P'ship v. THF Constr., Inc.*,

321 F.3d 1094 (11th Cir. 2003). ..........................................................14

*Jones v. Waffle House, Inc.*,

866 F.3d 1257 (11th Cir. 2017). ..........................................................14

* *JPay, Inc. v. Kobel*,

904 F.3d 923 (11th Cir. 2018)......................................................21, 38, 39

*Kinnon v. Univ. Underwriters Ins. Co.*,

418 So. 2d 887 (Ala. 1982)..................................................................40

*Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*,

845 F.3d 1351 (11th Cir. 2017)...................................................... 21, 25

*Lambert v. Austin Ind.*,

544 F.3d 1192 (11th Cir. 2008)....................................................................14

* *Lawson v. Life of the South Ins. Co.*,

648 F.3d 1166 (11th Cir. 2011)....................................................21, 23, 25–27

*Locke v. Ozark City Bd. of Educ.*,

910 So. 2d 1247 (Ala. 2005)....................................................................28, 35

*Lubin v. Starbucks Corp.*,

122 F.4th 1314 (11th Cir. 2024)..............................................................25, 27

*Markham v. City of Newport News*,

292 F.2d 711 (4th Cir. 1961)..........................................................................20

*Michie v. Bradshaw*,

149 So. 809 (Ala. 1933)..................................................................................3

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,

460 U.S. 1 (1983).............................................................................................5

*MTA, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

114 So. 3d 27 (Ala. 2012).................................................................23, 35, 36

*Neal v. GMRI, Inc.*,

No. 1:19-cv-647-RAH, 2020 WL 698270 (M.D. Ala. Feb. 11, 2020)............25

*Parnell v. CashCall, Inc.*,

804 F.3d 1142 (11th Cir. 2015). .................................................................. 21

*Rent-A-Center, W., Inc. v. Jackson*,

561 U.S. 63 (2010). ............................................................................ 21

*SAI Montgomery BCH, LLC v. Williams*,

559 U.S. 662 (2010)............................................................................29

*Southern Energy Homes, Inc. v. Ard*,

772 So. 2d 1131 (Ala. 2000). ..................................................................16, 36

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

559 U.S. 662 (2010)............................................................................ 21

*U.S. Nutraceuticals, LLC v. Cyanotech Corp.*,

769 F.3d 1308 (11th Cir. 2014). ............................................................ 14, 38

*United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union v. Wise Alloys, LLC*,

807 F.3d 1258 (11th Cir. 2015) ..................................................................xii

*Vankineni v. Santa Rosa Beach Dev. Corp. II*,

57 So. 3d 760 (Ala. 2010)......................................................................39

*Various Insurers v. Gen. Elec. Int'l, Inc.*,

131 F.4th 1273 (11th Cir. 2025). ............................................................ 28, 35

*Whaley v. Lawing*,

352 So. 2d 1090 (Ala. 1977). .................................................................... 33

* *Wiggins v. Warren Averett, LLC*,

307 So. 3d 519 (Ala. 2020)........................................................22–24, 26, 38

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,

881 F.3d 835 (11th Cir. 2018). ................................................................... 24

*WM Mobile Bay Env't Ctr., Inc. v. City of Mobile Solid Waste Disposal Auth.*,

No. 18-cv-429-KD-MU, 2020 WL 13539219 (S.D. Ala. Nov. 20, 2020) ...... 43

*Yates v. Christian Benev. Funeral Homes, Inc.*,

356 So. 2d 135 (Ala. 1978)......................................................................... 33

**Statutes:**

9 U.S.C. § 3 ........................................................................................... 5

9 U.S.C. § 16 ......................................................................................... xii

28 U.S.C. § 1332 ..................................................................................... xi

Ala. Code § 10-12-21 ........................................................................ 29, 30

**Other Authorities:**

Fed. R. App. P. 4 .................................................................................. xiii

Fed. R. Civ. P. 56 .............................................................................. 15, 44

S.D. Ala. L.R. 7......................................................................................... 6

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had original subject-matter jurisdiction over this action because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1).

Specifically, both plaintiff-appellee Christopher Andrew Yarborough and plaintiff-appellee SDP Enterprises, LLC (a limited liability company with Mr. Yarborough as its sole member) are citizens of Alabama while both defendant-appellant Judy Ard Belk and defendant-appellant ARDN Development, LLC (a limited liability company with Ms. Belk as its sole member) are citizens of Florida. (Dist. Ct. Doc. 1-1 at PageID# 2, ¶¶ 4–8).

As for the amount-in-controversy requirement, Appellees' Complaint sought an order compelling arbitration under a voting deadlock provision appearing within the operating agreement of QSL, LLC ("QSL I"). The alleged voting deadlock concerned Mr. Yarborough's informal request to be made co-manager and otherwise obtain control over QSL I, a company with millions of dollars of assets as well as tens of millions of dollars of guarantees. (*Id.* at PageID# 2–5, ¶¶ 9–32). Therefore, the value of the relief sought exceeds $75,000, and the amount-in-controversy requirement is satisfied.

This Court has appellate jurisdiction for the reasons set forth in Appellants' Response to this Court's Jurisdictional Question. (Doc. 18). To recount those reasons in short, this Court has jurisdiction to review the district court's orders (1) denying Appellants' motion to compel arbitration and (2) granting Appellees' motion for specific performance (which the district court construed as a motion to compel arbitration) for three reasons:

1. This Court has jurisdiction to review the district court's orders because they are "final," not interlocutory, "decision[s] with respect to an arbitration subject to" the FAA. 9 U.S.C. § 16(a)(3); *see* (Doc. 18 at 2–8).[1]

[1] Appellants represented in their Civil Appeal Statement that the district court's October 28, 2025, orders were interlocutory. (Doc. 6). The Civil Appeal Statement's function is to "set forth information necessary for an understanding of the nature of the appeal." 11th Cir. R. 33-1(a)(1). At the time Appellants noticed this appeal, they intended to pursue an interlocutory appeal of the district court's order denying their motion to compel arbitration and argue that this Court ought to exercise pendent appellate jurisdiction over the district court's order granting Appellees' motion to compel arbitration. This Court's Jurisdictional Question, however, prompted additional research which revealed that the district court's orders were final in nature. Appellants' previous, erroneous characterization does not doom its appeal, *see* (Doc. 19 at 20), just as a district court's erroneous characterization of its own order does not doom an appeal. *See, e.g.*, *United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union v. Wise Alloys, LLC*, 807 F.3d 1258, 1270 (11th Cir. 2015) (the district court cannot "transform[] what was, by definition, a final order into an interlocutory one"); *General Television Arts, Inc. v. Southern Ry. Co.*, 725 F.2d 1327, 1331 (11th Cir. 1984) (a district court's "mislabeling" of an order or judgment as final "does not make it so"). What matters is the nature of the orders challenged on appeal. Here, they are final.

2. Assuming for the sake of argument that the orders were not final decisions within the meaning of § 16(a)(3) of the FAA, this Court has jurisdiction to review the district court's order denying Appellants' motion to compel arbitration because when "a district court denies a party's motion to compel arbitration, that party may take an interlocutory appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023); *see* (Doc. 18 at 8–11).

3. Still assuming for the sake of argument that the district court's orders are interlocutory, rather than final, to ensure meaningful review of the district court's order denying Appellants' motion to compel arbitration, this Court should exercise its discretionary pendent appellate jurisdiction to review the district court's order granting Appellees' motion for specific performance because it is inextricably intertwined with the order denying Appellants' motion. *See* (Doc. 18 at 11–14).

The orders of the district court challenged on appeal were both entered on October 28, 2025. Appellants filed their Notice of Appeal on November 25, 2025. This appeal, therefore, was timely filed. FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Did the district court err when it declined to apply Alabama law requiring non-signatories of an arbitration agreement to arbitrate arbitrability under that agreement when it includes a delegation clause?

2. Did the district court err when it determined Appellees are not third-party beneficiaries of the Limited Liability Company Agreement of QSL II, LLC ("QSL II Agreement")?

3. Did the district court err when it determined Appellees were not equitably estopped from avoiding arbitration under the QSL II Agreement given their earlier service of a demand upon Ms. Belk pursuant to the QSL II Agreement's arbitration provision?

4. Assuming that the QSL II Agreement does not bind Appellees (though it does), did the district court err when it declined to decide whether a voting deadlock sufficient to initiate arbitration under the Amended and Restated Operating Agreement for QSL I ("QSL I Agreement") existed and, instead, sent to arbitration under the QSL I Agreement this "gateway question" in the absence of a delegation clause?

## STATEMENT OF THE CASE

This case stems from a governance dispute relating to QSL I and QSL II. The action below presented a single issue related to the broader governance dispute: Which of two arbitration provisions appearing in two separate agreements govern the parties' underlying dispute? More directly, may a party claim an arbitration provision does not apply to him when he previously invoked his rights under that very same provision for the same controversy?

### I. Course of Proceedings and Dispositions in the Court Below.

Although the parties agreed that the underlying governance dispute should be arbitrated, they could not agree as to which arbitration provision applied. So, Appellees filed the instant action in Alabama state court seeking entry of an order compelling arbitration under the QSL I Agreement. *See* (Dist. Ct. Doc. 1-1 at PageID# 163–84). Appellees did not bring any substantive claims for relief related to the underlying dispute; therefore, the court was not tasked with resolving the dispute.

Appellants removed the Complaint to federal court. (Dist. Ct. Doc. 1). At the same time, Appellants moved the district court to compel arbitration under the QSL II Agreement and for a determination that the arbitrability of the dispute is subject to the delegation clause appearing within the QSL II Agreement. (Dist. Ct. Doc. 4);

(Dist. Ct. Doc. 22). Appellees, thereafter, moved the district court for entry of an order compelling arbitration under the QSL I Agreement. (Dist. Ct. Doc. 7).

Accordingly, the district court was charged with determining which of two arbitration provisions applied to the dispute before it and who should decide arbitrability—the court or an arbitrator. The district court answered those questions in its October 28, 2025, orders resolving Appellants' and Appellees' competing motions concerning arbitration. (Dist. Ct. Doc. 23). In a fulsome opinion, the district court entered orders (1) denying Appellants' motion to compel arbitration and (2) granting Appellees' motion for specific performance. (*Id.*).

In denying Appellants' motion, the district court found the following:[2]

1. Mutual assent between Appellants and Appellees "to the delegation clause in" the QSL II Operating Agreement "is not evident" because Appellees are not signatories to the QSL II Operating Agreement. (*Id.* at PageID# 839).

2. Notwithstanding Alabama jurisprudence to the contrary, the district court retains discretion to determine whether non-signatories to an agreement containing a delegation clause must arbitrate arbitrability. (*Id.* at PageID# 836). The Alabama Supreme Court's holding in *Anderton v. The Practice-Monroeville, P.C.*, 164

[2] Appellees dispute these legal findings by the district court.

So. 3d 1094 (Ala. 2014), "that a non-signatory must be compelled to arbitrate arbitrability whenever the AAA rules are incorporated is not a traditional principle of state law contract law that binds" the district court "pursuant to" *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009). (Dist. Ct. Doc. 23 at PageID# 837). Going further, the district court opined that "[n]o ordinary state-law principle governing the formation of contract (e.g., assumption, third-party beneficiary theories, estoppel) supports that conclusion." (*Id.*).

3. The equitable estoppel exception to the rule that non-signatories are not bound to a contract does not apply in this case because Appellees "assert claims . . . that do not depend on the QSL II operating agreement"; instead, "the claims in this case relate solely to governance of QSL [I], a separate entity from QSL II." (*Id.* at PageID# 839).

4. Although Alabama law provides that a third-party beneficiary to a contract assumes its burdens when he claims its benefits, *Michie v. Bradshaw*, 149 So. 809, 814 (Ala. 1933), Appellees were not bound to the QSL II Agreement even though they filed an arbitration demand under the QSL II Agreement prior to filing the instant action. (Dist. Ct. Doc. 23 at PageID# 841). In support, the district court reasoned that (1) the "claims in this case relate to the governance of QSL [I] and in no way invoke any benefits delineated in the QSL II agreement," and, further, (2) Mr.

Yarborough did not "claim the benefits" of the QSL II Agreement within the meaning of the doctrine because he withdrew his arbitration demand. (*Id.*).

5. For these reasons, the district court was "not satisfied that the parties agreed to arbitrate arbitrability under the QSL II Agreement." (*Id.* at PageID# 848).

In granting Appellees' motion, the district court found the following:

1. The QSL I Agreement does not contain a delegation clause, so issues of substantive arbitrability are for the district court to decide. (*Id.* at PageID# 843).

2. Appellants and Appellees are signatories to the QSL I Agreement, so the QSL I Agreement exists. (*Id.*).

3. A dispute involving a "deadlock in the voting" falls within the scope of the QSL I Agreement. (*Id.* at PageID# 844).

4. Whether there is a "deadlock in the voting" is a "procedural condition precedent" to arbitration, the satisfaction of which is for an arbitrator—not the district court—to decide. (*Id.* at PageID# 844–45).

5. "There is ambiguity . . . in whether this is a *voting* deadlock because no formal voting on the co-manager issue has occurred. . . . As a result, it is not entirely clear whether the parties' dispute falls within the scope of the QSL [I] Agreement." (*Id.* at PageID# 845).

6. In any event, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," so the dispute falls within the scope of the QSL I Agreement. (*Id.*) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

7. The QSL I Agreement "evidences a transaction affecting interstate commerce." (*Id.* at PageID# 846).

8. "Having been satisfied that the making of the QSL [I] Agreement and the failure to comply with it is not in issue, the [district court] must make an order compelling arbitration under the QSL [I] Agreement." (*Id.* at PageID# 847–48).

9. "Until 'one of the parties' moves for a stay of the action pending arbitration under the QSL [I] Agreement, this action remains pending." (*Id.* at PageID# 848).

After the October 28, 2025, orders issued, and at the district court's urging, *see* (*id.*), Appellees moved the district court to stay the action pursuant to 9 U.S.C. §

3, (Dist. Ct. Doc. 25),[3] which motion was granted four business days later, (Dist. Ct. Doc. 26).[4]

In the motion to stay, Appellees conceded that, given the district court's October 28, 2025, orders, "further litigation in this proceeding is unnecessary." (Dist. Ct. Doc. 25 at PageID# 856). And in the order purporting to impose a stay, the district court adopted Appellees' representation that "further litigation in this proceeding is unnecessary." (Dist. Ct. Doc. 26 at PageID# 859). It is therefore undisputed that the district court's October 28, 2025, orders ended the litigation on the merits.

On November 25, 2025, Appellants noticed their appeal of the district court's orders concerning Appellants' motion to compel arbitration and Appellees' motion for specific performance. (Dist. Ct. Doc. 27).

## II. <u>Statement of the Facts.</u>

The parties' relationship stretches back two decades, when QSL I was formed in 2006 as a real-estate development company with four members: Ms. Belk, Mr.

---

[3] "Plaintiffs . . . , pursuant to . . . the Court's Order entered on October 28, 2025 (Doc. 23), file this Motion to respectfully request the Court stay further proceedings in this matter . . . ." (Dist. Ct. Doc. 25 at PageID# 854).

[4] Appellants note that the district court granted Appellees' motion to stay the action eight days before Appellants' deadline to respond in opposition to it. *See* S.D. Ala. L.R. 7(c).

Yarborough, non-party Terry Glenn Barclary, and non-party Dr. Joseph Story. (Dist. Ct. Doc. 12-1 at PageID# 490). Ms. Belk was appointed as the sole Manager at QSL I's inception and has remained the sole Manager ever since. (*Id.* at PageID# 482, ¶ 4). QSL I's membership, however, has changed since its formation. *See* (*id.* at PageID# 525). At present, QSL I has two voting members: ARDN (Ms. Belk's holding company) and SDP (Mr. Yarborough's holding company). The economic interests of QSL I are held by ARDN, SDP, and Jackie Barclay (Ms. Barclay is the widow of Mr. Barclay, a deceased founding member of QSL I). (*Id.* at PageID# 483, ¶ 10). Ms. Belk is ARDN's sole member; Mr. Yarborough is SDP's sole member. (Dist. Ct. Doc. 1-1 at PageID# 172, ¶¶ 2, 4). Under Ms. Belk's leadership, QSL I developed senior housing communities throughout the southeastern United States. (Dist. Ct. Doc. 12-1 at PageID# 482, ¶ 5).

Now, QSL I and QSL II are simply entities that hold interests in other entities; QSL I and QSL II have no ongoing operations. (Dist. Ct. Doc. 1-1, PageID# 155). There are no employees. (*Id.*). There is no revenue. (*Id.*). And they have little to no authority in the five developments in which they hold profits interests. (*Id.*).

While not a party to this action nor a member of QSL I, Russel Myles is an important player in the business dispute. A former Senior Partner at McDowell Knight, Mr. Myles represented QSL I and its affiliates in business matters for years.

*See* (Dist. Ct. Doc. 12-1 at PageID# 484, ¶¶ 20–22); *see also* (Dist. Ct. Doc. 1-1 at PageID# 140). During Mr. Myles's representation of QSL I, he and Mr. Yarborough reached an agreement whereby he would join another QSL-entity—QSL Management, LLC ("QSLM")—as its general counsel and, thereafter, become a part-owner of the soon-to-be formed QSL II, LLC ("QSL II") and later a party to an alleged Put Agreement whereby he could purportedly force QSL II to redeem part of his ownership interest. (Dist. Ct. Doc. 12-1 at PageID# 484–85, ¶¶24–26).

In 2020, QSL I (and other members) formed QSL II for future developments. (*Id.* at PageID# 484, ¶ 16). The original governing documents (drafted by Mr. Myles) appointed Mr. Yarborough as Co-Manager at QSL II's inception, alongside the drafter—Mr. Myles. (Dist. Ct. Doc. 4-2 at PageID# 266, § 4.2). When forming QSL II, QSL I retained control over most decisions as the majority-in-interest member, (*id.* at PageID# 266–67, §§ 4.3 and 4.7) (powers of majority-in-interest member) and (*id.* at PageID# 283) (identifying QSL I as the majority-in-interest member), and Ms. Belk was and remains entitled to make these decisions as the sole Manager of QSL I, (Dist. Ct. Doc. 12-1 at PageID# 526, § 1.6).

When forming QSL II, no Put Agreement to the benefit of Mr. Myles was drafted or executed. (Dist. Ct. Doc. 12-1 at PageID# 484). Three years after the fact, Mr. Myles conspired with Mr. Yarborough to draft the Put Agreement and backdate

it to 2020, which Mr. Myles then sought to exercise via a proposed confessed judgment he also drafted. (*Id.*); (Doc. 1-1 at PageID# 146). QSL I, as the majority-in-interest member of QSL II, prevented Mr. Myles's purported enforcement because the so-called Put Agreement was improperly obtained and legally deficient. (Dist. Ct. Doc. 12-1 at PageID# 484). Ms. Belk, through counsel, has "repeatedly stated that Mr. Myles' purported Agreement was invalid and unenforceable because it lacked the requisite authority" and "was unethically entered into by Mr. Myles." (Dist. Ct. Doc. 12-3 at PageID# 639).

The QSL II Agreement required Ms. Belk to approve the Put Agreement. (Dist. Ct. Doc. 12-1 at PageID# 571, § 4.7). Transactions over $10,000 must be approved by the majority-in-interest member of QSL II, which is QSL I. (*Id.*). Ms. Belk, as Manager, controls QSL I. (Dist. Ct. Doc. 12-1 at PageID# 498, § 5.1). Thus, for the Put Agreement to be enforceable under the QSL II Agreement (a document drafted by Mr. Myles), Ms. Belk was required to approve it, and she did not. Moreover, Mr. Myles was serving as the lawyer to both QSL I and QSL II and engaged in multiple business transactions with his clients without complying with his ethical obligations, disclosing the conflict-of-interest, advising QSL I and QSL II to seek other counsel, or otherwise receiving QSL I and QSL II's informed consent.

(*See* Dist. Ct. Doc. 12-1, PageID# 484-85). These business transactions include the QSL II Agreement, whereby he obtained ownership, and the Put Agreement.

In June 2025, Mr. Myles sued Ms. Belk, QSL I, and QSL II in Alabama state court alleging fraud, breach of contract, and promoter liability due to his inability to execute upon his alleged Put Agreement. (Dist. Ct. Doc. 1-1 at PageID# 140–50). However, the QSL II Agreement (again, drafted by Mr. Myles) included a mandatory arbitration clause. (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1). Accordingly, Ms. Belk and QSL I moved the state court to compel arbitration of the dispute pursuant to the QSL II Agreement, (Dist. Ct. Doc. 1-1 at PageID# 41–52), which arbitration clause states, in part:

> Except as otherwise specifically provide herein, *any dispute* (whether in contract, tort, statute, law, or equity) that *may be based upon, arise out of, or relate in any way to this Agreement and/or the relationship of the Company, the Members, and/or the Manager* (and any person acting at the Manager's direction) *shall be resolved by binding arbitration* in Pensacola, Florida pursuant to the Federal Arbitration Act (9 U.S.C. § 1, et seq).

(Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1) (emphasis added).

Inexplicably, this upset Mr. Yarborough, who complained that the motion to compel arbitration was void as to QSL I because Ms. Belk—QSL I's sole Manager—lacked authority to so act on QSL I's behalf. (Dist. Ct. Doc. 1-1 at PageID# 180, ¶ 36).

The following month, QSL I exercised its discretion as the majority-in-interest member of QSL I to remove Mr. Yarborough as Co-Manager of QSL II. (Dist. Ct. Doc. 12-1 at PageID# 483, ¶¶ 12–15). That did not sit well with Mr. Yarborough. At present, Ms. Belk is QSL II's sole Manager.

From that point onward, in an effort to regain some degree of control over QSL II, Mr. Yarborough insisted to Ms. Belk that he should be appointed as a co-manager of QSL I (which is, again, QSL II's majority-in-interest member), alongside Ms. Belk. Before Ms. Belk would consider Mr. Yarborough's request, she asked him to provide his communications with Mr. Myles to understand the scope of their collusion. Specifically, on August 4, 2025, counsel for Ms. Belk requested certain information from Mr. Yarborough, and he refused to provide his communications from Mr. Myles. (Dist. Ct. Doc. 12-3, PageID#639). On four separate occasions, counsel for Ms. Belk requested to speak to Mr. Yarborough about the issues that need to be addressed before Ms. Belk can consider the co-manager request, and Mr. Yarborough refused to speak to Ms. Belk's counsel. (Dist. Ct. Doc. 12-3 at PageID#639-40).

Mr. Yarborough has various conflicts that need to be addressed before Ms. Belk considers his request to be made co-manager. These conflicts include (1) Mr. Yarborough's refusal to disburse employee retention tax credits funds, which are indirectly owed to QSL I by a company controlled by Mr. Yarborough (he has

improperly withheld the funds); (2) the need to sell a corporate plane and a hanger, which Mr. Yarborough has treated as his own personal plane and he has stated he wants to purchase either directly or indirectly; (3) the resolution of the Myles litigation in which Mr. Yarborough has advocated for conceding liability despite the fact that the purported Put Agreement is ineffectual. (*Id.* at PageID# 640). Mr. Yarborough, however, has refused to work through these conflicts or provide the basic information that Ms. Belk requested.

In August 2025, *Mr. Yarborough*, Mr. Myles, and other members of QSL II commenced an arbitration against Ms. Belk by serving an arbitration demand upon her. (Dist. Ct. Doc. 4-1). The arbitration demand was *made pursuant to the QSL II Agreement*. (*Id.*). In it, Mr. Yarborough alleges that he is a 50% equity owner of QSL I and claims that Ms. Belk acted unilaterally as Manager of QSL I to remove him as Co-Manager of QSL II without authorization from QSL II's other members (notwithstanding QSL I's majority-in-interest stake in QSL II). (*Id.* at PageID# 255). Specifically, the arbitration demand sought a determination that Ms. Belk as Manager of QSL I improperly removed Mr. Yarborough as Co-Manager of QSL II and further sought an order prohibiting Ms. Belk as Manager of QSL I from taking unilateral actions on behalf of QSL II. (*Id.* at PageID# 256–57). Accordingly, the key legal issue

that Mr. Yarborough submitted to an arbitrator under the QSL II Agreement was to interpret Ms. Belk's authority under the QSL I Agreement.

In serving the arbitration demand on Ms. Belk, Mr. Yarborough asked Ms. Belk's counsel for her choice of an arbitrator. (Dist. Ct. Doc. 4-3). Days later, Ms. Belk's counsel sent Mr. Yarborough's counsel—who happens to be Anne Laurie McClurkin, Appellees' counsel of record in this appeal—a list of proposed arbitrators. (Dist. Ct. Doc. 4-4 at PageID# 352). Yet, on August 23, 2025, Ms. McClurkin withdrew the arbitration demand on Mr. Yarborough's behalf "pending determination of the member deadlock." (*Id.* at PageID# 351).[5]

Four days later, Appellees filed the instant action in Alabama state court seeking entry of an order to compel arbitration under the QSL I Agreement to resolve an alleged "voting deadlock" between the members—ARDN (Ms. Belk) and SDP (Mr. Yarborough). (Dist. Ct. Doc. 1-1 at PageID# 163–84). As part of the Complaint, Mr. Yarborough and SDP included the *QSL II Agreement* and the applicable AAA Rules. (Dist. Ct. Doc. 1-1 at PageID #56-139).

[5] Notably, Mr. Myles (General Counsel of QSLM) is Ms. McClurkin's (Assistant General Counsel of QSLM) boss. *See* (Dist. Ct. Doc. 12-3, PageID# 640, ¶ 8). Ms. McClurkin did not represent Mr. Myles—nor any other claimant—in the arbitration demand. Nor could she have, given readily apparent conflicts of interest. QLSM is an entity now owned 100% by Mr. Yarborough. Ms. Belk has no relationship with it.

## III. Standard of Review.

This Court reviews "*de novo* both the district court's denial of a motion to compel arbitration and the district court's interpretation of an arbitration clause." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1263 (11th Cir. 2017) (internal citations omitted); *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1310 (11th Cir. 2014) (Pryor, J.) (reversing a district court's denial of a motion to compel arbitration because "the district court should have sent this dispute to arbitration for an arbitrator to decide the question of arbitrability"). The same is true when this Court reviews a district court's order compelling arbitration. *In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014).

Accordingly, this Court must determine whether parties agreed to arbitrate and, if so, whether their agreement encompasses the asserted claims. *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). If both conditions are met, this Court must order the district court to compel arbitration. *John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094, 1095 (11th Cir. 2003). The court's ruling is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate." *In re Checking Acct. Overdraft Litig.*, 754 F.3d at 1294. To prevail, the movant must show "that there is no genuine

dispute as to any material fact" on the question of whether the parties agreed to arbitrate. FED. R. CIV. P. 56(a).

## SUMMARY OF ARGUMENT

1. Diversity jurisdiction's principal function is to ensure that an out-of-state litigant gets a fair shake. Removal to federal court of a state court action is not intended to—and should not—produce a different decision on the merits of the underlying dispute. Regrettably, Appellants (who removed this case to federal court) would've been better off in state court where the judge would have applied well-settled Alabama law holding that even non-signatories to an arbitration agreement must arbitrate arbitrability when the underlying arbitration agreement includes a valid delegation clause. Instead, the district court disregarded binding Alabama law because it disagreed with its logic, supplanted its own understanding of what the law ought to be, and, thus, denied Appellants' motion to compel arbitration. It erred in doing so.

2. Moreover, Appellees are third-party beneficiaries of the QSL II Agreement. The QSL II Agreement's arbitration clause contemplates Appellees. The QSL II Agreement further bestows a direct benefit upon Appellees. And Appellees invoked that very benefit by serving an arbitration demand thereunder

upon Ms. Belk. So, the QSL II Agreement's arbitration provision binds Appellees, whether or not they signed it.

3. Even if Appellees are not third-party beneficiaries of the QSL II Agreement (though they are), they are nonetheless equitably estopped from avoiding arbitration under that agreement because they previously invoked that agreement's arbitration provision in a demand directed to Ms. Belk. "A plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions." *Southern Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1134 (Ala. 2000).

4. Because the QSL II Agreement contains a delegation clause that binds Appellees and contemplates their claim, the district court erred when it construed the scope of the QSL I Agreement—a matter reserved for decision by an arbitrator pursuant to the QSL II Agreement's delegation clause. And even if the QSL II Agreement does not bind Appellees, such that questions of arbitrability are to be decided by the court, the district court nonetheless erred when it construed the QSL I Agreement's arbitration provision to contemplate disputes as to whether a "voting deadlock" exists. The plain language of the QSL I Agreement reveals that the parties agreed to submit to arbitration *only* in the presence of a voting deadlock; thus, whether a voting deadlock exists is not a stand-alone, arbitrable claim available under the QSL I Agreement but is, instead, a question of substantive arbitrability for

decision by a judge. The district court, thus, further erred when it delegated determination of this "gateway question" to an arbitrator in the absence of a delegation clause in the QSL I Agreement permitting it to do so.

## ARGUMENT

Should removal to federal court of a state-court complaint seeking entry of an order compelling arbitration result in a different decision on the merits of the request for relief? Of course not. But that is what occurred here. The district court ignored the law of Alabama—going as far as relying on a dissenting opinion filed in the controlling state-law case—to deny Appellants' motion to compel arbitration. (Dist. Ct. Doc. 23 at PageID# 832–38). If this case were not removed from Alabama state court, Appellants' motion to compel arbitration would have been granted under long-settled Alabama law and Appellees' competing motion would have been denied. *See, e.g.*, *Fielder v. Lee Staffing, Inc.*, No. 2:19-cv-186-MHT, 2019 WL 6359149, at *3 (M.D. Ala. Nov. 27, 2019) (applying Alabama law to compel arbitration of arbitrability with non-signatories); *Bd. of Trs. of Univ. of Alabama v. Humana, Inc.*, No. 2:24-CV-165-RDP, 2024 WL 1748434, at *4 (N.D. Ala. Apr. 23, 2024) (same and collecting cases). This outcome violates a fundamental principle justifying diversity jurisdiction and warrants careful review.

Further, setting aside the comity concern, the district court further erred when it found that no equitable principles justify subjecting Appellees to the QSL II Agreement's arbitration clause. (Dist. Ct. Doc. 23 at PageID# 839–42). The third-

party beneficiary doctrine and principle of equitable estoppel both place Appellees well within the reach of the QSL II Agreement's arbitration provision.

Finally, the district court erred when it granted Appellees' motion for specific performance and compelled arbitration under the QSL I Agreement for two reasons. First, whether "a dispute involving a 'deadlock in the voting' falls within [the] scope" of the QSL I Agreement is an issue of substantive arbitrability reserved for decision by an arbitrator pursuant to the QSL II Agreement's delegation clause—but the district court decided the question anyway. (*Id.* at PageID# 844). Second, if the QSL II Agreement does not bind Appellees (though it does), the district court nonetheless misread the QSL I Agreement's arbitration provision to conclude its scope includes disputes concerning the existence of a voting deadlock. It does not. In fact, the parties' agreement to arbitrate is conditioned upon the preexistence of a voting deadlock. Thus, whether a voting deadlock exists within the meaning of the QSL I Agreement is a "gateway question" of substantive arbitrability reserved for decision by a judge, not a "procedural condition precedent" for decision by an arbitrator. So, if Appellees are not bound by the QSL II Agreement's delegation clause (they are), the district court was tasked with answering that gateway question yet declined to do so, despite opining that it was uncertain whether a voting deadlock exists. *See* (*id.* at PageID# 845).

This Court can right the ship. It should (1) vacate the district court's order granting Appellees' motion for specific performance, (2) vacate the district court's order denying Appellants' motion to compel arbitration, and (3) remand with instructions for the district court to compel the parties to arbitrate—under the QSL II Agreement—whether a "voting deadlock" sufficient to invoke the QSL I arbitration provision exists.

## I. The district court erred when it denied Appellants' motion to <u>compel arbitration under the QSL II Agreement.</u>

### a. The district court erred when it undermined the "basic rationale" for diversity jurisdiction by (admittedly) ignoring binding Alabama law to reach a different decision on the merits than an Alabama state court would have.

The district court sat in diversity. Diversity jurisdiction's "basic rationale" is to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties," *Hertz Corp. v. Friend*, 559 U.S. 77, 85 (2010), not to provide parties with an avenue to achieve a different merits-based outcome. In other words, a "nonresident litigant in resorting to the federal diversity jurisdiction should obtain the same relief a resident litigant asserting the same cause of action would receive in the state courts." *Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir. 1961). To achieve that end, "where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the

outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945).

The rules do not change when a party moves in a federal forum to compel arbitration of a state-law dispute, as state contract law governs the analysis of whether the parties committed an issue to arbitration. *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015). "Thus, in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005). This means that "determining whether a claim falls within the scope of an arbitration agreement 'is generally a matter of state law.'" *Entrekin v. Internal Med. Associates of Dothan, P.A.*, 689 F.3d 1248, 1251 (11th Cir. 2012) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)). It also means that "state law provides the rule of decision for" the question of whether a contract may "be enforced by or against nonparties to the contract[.]" *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170–71 (11th Cir. 2011) (discussing *Carlisle*, 556 U.S. at 632); *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017).

This case originated in Alabama state court. *See* (Dist. Ct. Doc. 1-1 at PageID# 170–91); (Dist. Ct. Doc. 1). And all the parties rely on Alabama law. *See* (Dist. Ct. Doc. 4); (Dist. Ct. Doc. 7). So, Alabama law is presumed to apply. *Bailey v. ERG Enters., L.P.*, 705 F.3d 1311, 1320 (11th Cir. 2013). "The final arbiter of state law is the state supreme court, which is another way of saying that Alabama law is what the Alabama Supreme Court says it is." *Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) (collecting cases). Regrettably, the district court did not faithfully apply Alabama law, and, thus, ruled on the merits of this case differently than an Alabama state court would have.

Appellants moved to compel arbitration under the QSL II Agreement. (Dist. Ct. Doc. 4); (Dist. Ct. Doc. 22). Appellees are non-signatories to the QSL II Agreement. Nonetheless, the QSL II Agreement incorporates the American Arbitration Association's Commercial Arbitration Rules (the "AAA Rules"), which provide that threshold questions of substantive arbitrability are to be resolved by an arbitrator, not a court. (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1). And in Alabama, when the AAA Rules are incorporated into an arbitration provision, "it is 'clear and unmistakable' that substantive-arbitrability decisions are to be made by the arbitrator." *Wiggins v. Warren Averett, LLC*, 307 So. 3d 519, 523 (Ala. 2020)

(collecting cases); *JPay, Inc. v. Kobel*, 904 F.3d 923, 937 (11th Cir. 2018) (holding the same and collecting cases).

This is true even as between signatories and non-signatories to the agreement: In the presence of a valid delegation clause, whether the "dispute between a nonsignatory and a signatory" is subject to arbitration "is a question of substantive arbitrability" to be "delegated to the arbitrator[.]" *Anderton*, 164 So. 3d at 1101–02; *Wiggins*, 307 So. 3d at 522 ("whether the scope of an arbitration provision applies to nonparties or nonsignatories to an arbitration provision is [] a question of arbitrability") (citing *Anderton*, 164 So. 3d at 1101 and *MTA, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 So. 3d 27, 32 (Ala. 2012)). Thus, "the decision whether the arbitration provision may be enforced against a nonsignatory to the contract" must be made by an arbitrator—not a court. *Wiggins*, 307 So. 3d at 523 (collecting cases).

Again, state law answers the question of "whether an arbitration provision applies to nonparties or nonsignatories, as is the issue here." *Humana,* 2024 WL 1748434, at *4 (collecting cases). Because the QSL II Agreement's arbitration clause adopts the AAA Rules, whether it may reach Appellees, as non-signatories, is, therefore, a question of arbitrability to be decided by an arbitrator, not a judge. *Wiggins*, 307 So. 3d at 523; *Anderton*, 164 So. 3d at 1101–02; *Lawson*, 648 F.3d at 1171;

*Humana*, 2024 WL 1748434, at *4. Accordingly, if Appellants' motion were decided by an Alabama state court judge, it would've been granted.

Despite sitting in diversity, the district court denied Appellants' motion. By its own admission, the district court refused to follow binding Alabama law because it disagreed with the decision's logic: "It is not logical to conclude that the incorporation of the AAA rules shows clear and unmistakable evidence that a nonparty to that agreement agreed to delegate arbitrability." (Dist. Ct. Doc. 23 at PageID# 838) (emphasis deleted). Worse still, the district court directed the parties to the dissenting opinion filed by Justice Brad Mendheim in *Wiggins*—a decision in which the Supreme Court of Alabama reinforced its long-standing rule that a non-signatory must arbitrate arbitrability when the arbitration provision contains a delegation clause—"[f]or a longer discussion on the *issues* with this idea[.]" (Dist. Ct. Doc. 23 at PageID# 836 n.4) (emphasis added).

But Alabama "law is what the" Supreme Court of Alabama "says it is"—not what the district court says it should be—and the district court was "bound to apply" Alabama's reading of Alabama law "even if" it "think[s] that decision is wrong." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 848 (11th Cir. 2018). In other words, *Wiggins* controls. Not its dissent.

In supposed support of its rejection of binding Alabama law, the district court paradoxically relied on this Court's opinion in *Lubin v. Starbucks Corp.*, 122 F.4th 1314 (11th Cir. 2024)—a case in which this Court faithfully (and appropriately) applied the law of Florida. In *Lubin*, this Court explained that "[s]tate law controls on whether an arbitration clause in a contract can be enforced against a non-signatory to that contract." *Id.* at 1321 n.2 (citing *Kroma Makeup EU*, 845 F.3d at 1355 n.1 and *Lawson*, 648 F.3d at 1170–71). So, applying Florida law, *Lubin*, 122 F.4th at 1321 n.2, this Court determined that "the terms of the arbitration agreement" did not require "Lubin"—a nonsignatory—"to arbitrate his claim against Starbucks, absent another principle of law or equity." *Id.* at 1320–21.

It goes without saying that Alabama law is not Florida law. Alabama law is the law of Alabama. And—as both the Northern District and Middle District of Alabama recognize—in Alabama, "an arbitrator must decide whether" an arbitration clause is enforceable as to "nonsignatories." *Humana*, 2024 WL 1748434, at *5 (granting motion to compel arbitration with non-signatories); *Fielder*, 2019 WL 6359149, at *3 (holding that "the question of enforcement" of an arbitration provision with a non-signatory is "delegate[d] . . . to the arbitrator" when the arbitration agreement contains a valid delegation clause); *Neal v. GMRI, Inc.*, No. 1:19-cv-647-RAH, 2020 WL 698270, at *5 (M.D. Ala. Feb. 11, 2020) (same). *Lubin*'s application of Florida

law does not compel a different result. *See Humana*, 2024 WL 1748434, at *5 ("While courts in other Circuits may decide this issue differently, the law in Alabama provides that, in this context, an arbitrator must decide[.]"). Nor does the district court's misguided rejection of Alabama law.

The district court further relied on *Carlisle*, but in doing so it ignored a critical part of that decision: the FAA "cannot possibly require the disregard of state law permitting arbitration by *or against* nonparties to the written arbitration agreement." 556 U.S. at 631 (emphasis added). Of course, that's exactly what the district court did. It readily disregarded Alabama law "permitting arbitration" against non-signatories to the QSL II Agreement to reach a contrary result on no authority but its own. Appellants weren't given a fair shake in federal court.

In sum, when a contract "delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 68 (2019). The QSL II Agreement delegates the arbitrability question to an arbitrator. (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1(iii)). In Alabama, whether an arbitration agreement may be enforced against a non-signatory is a question of arbitrability. *Wiggins*, 307 So. 3d at 523; *Anderton*, 164 So. 3d at 1101–02; *Lawson*, 648 F.3d at 1171; *Humana*, 2024 WL 1748434, at *4. And "state law provides the rule of decision for" the question of whether a contract may "be enforced by or

against nonparties to the contract[.]" *Lawson*, 648 F.3d at 1170–71 (discussing *Carlisle*, 556 U.S. at 632). Consequently, the district court "possesse[d] no power to decide the arbitrability issue" and, instead, should have granted Appellants' motion to compel arbitration. *Henry Schien*, 586 U.S. at 68. This Court should vacate the district court's order denying Appellants' motion to compel arbitration and remand with instructions for the district court to grant Appellants' motion.

**b. Even if binding Alabama law does not control (it does), the district court nonetheless erred by finding that Appellees are not bound to the QSL II Agreement's arbitration clause simply because they did not sign the document.**

Even if this Court were to determine that it was appropriate for the district court to reject the Supreme Court of Alabama's many decisions holding that non-signatories must arbitrate arbitrability when the AAA Rules are adopted in an arbitration agreement, the district court still fatally erred. Appellees are bound by the QSL II Agreement's arbitration provision not only by operation of state law, but also under equitable principles. *See Lubin*, 122 F.4th at 1321 (explaining that where the terms of the agreement do not bind non-signatories by operation of state contract law, the non-signatories may nonetheless be bound to the agreement by "another principle of law or equity").

#### i. Appellees are third-party beneficiaries of the QSL II Agreement.

Appellees are third-party beneficiaries of the QSL II Agreement. A "third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory." *Various Insurers v. Gen. Elec. Int'l, Inc.*, 131 F.4th 1273, 1277 (11th Cir. 2025); *Custom Performance, Inc. v. Dawson*, 57 So. 3d 90, 97 (Ala. 2010). Specifically, a non-signatory can be bound to an arbitration agreement if "the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental benefit upon the third party." *Dunning v. New England Life Ins. Co.*, 890 So. 2d 92, 97 (Ala. 2003); *Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1251 (Ala. 2005) (same).

The QSL II Agreement bestows direct benefits upon Appellees:

> Notwithstanding any other provision of this Agreement to the contrary, it is the intention of the parties that *this arbitration clause shall inure to the benefit of any agent*, principal, officer, successor, or assignee of *any* of the parties to this Agreement.

(Dist. Ct. Doc. 4-2 at PageID# 274, § 10.1(vi)) (emphasis added).

Further, the QSL II Agreement's arbitration provision contemplates Appellees and the underlying business dispute (Mr. Yarborough's right to exercise managerial control over QSL I such that he can make decisions on behalf of QSL II):

> Except as otherwise specifically provided herein, *any dispute* (whether in contract, tort, statute, law, or equity) that *may be based upon, arise out of, or relate in any way to this Agreement and/or the relationship of the Company, the Members, and/or the Manager* (and any person acting at the Manager's direction) *shall be resolved by binding arbitration* in Pensacola, Florida pursuant to the Federal Arbitration Act (9 U.S.C. § 1, et seq).

(*Id.* at PageID# 273, § 10.1) (emphasis added).

These provisions reveal the broad scope of claims contemplated by the QSL II Agreement's arbitration provision as well as its reach to third-party beneficiaries. As an initial mater, the QSL II Agreement's arbitration provision covers "any dispute" that may be based upon, arise out of, or relate in any way to the QSL II Agreement and/or the relationship of QSL II, its members, and/or Mr. Yarborough. This dispute falls under the clause's broad ambit. Indeed, the arbitration provision here specifically contemplated claims arising between "the Members," the "Manager," and "any agent, principal, officer, successor, or assignee of any of the parties to" the agreement—Appellees included.

Mr. Yarborough was a Co-Manager of QSL II. (*Id.* at PageID# 266, § 4.2) ("The Members acknowledge that, as of the Effective Date, Andy Yarborough and Russel Myles shall act as the Co-Managers of the Company."). "Every manager is an agent of the limited liability company for the purpose of its business or affairs[.]"

Ala. Code § 10-12-21(a)(2). And "[u]nder a long line of cases," the Supreme Court of Alabama "has explained that an agent 'stands in the shoes of his principal' and is covered under the terms of his principal's arbitration agreement." *SAI Montgomery BCH, LLC v. Williams*, 295 So. 3d 1048, 1053 (Ala. 2019) (collecting cases). Mr. Yarborough is, accordingly, subject to the QSL II Agreement's arbitration provision as an agent. (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1).

Further, QSL I is a member of QSL II. (*Id.* at PageID# 277). SDP, Mr. Yarborough's holding company, is a member of QSL I. (Dist. Ct. Doc. 1-1 at PageID# 33). Indeed, it is SDP's membership interest in QSL I that forms the precipice of the instant action, as Mr. Yarborough—SDP's sole member—intends to leverage SDP's interest in QSL I to gain authority over QSL II via QSL I's majority-in-interest stake in QSL II. As Mr. Yarborough's Verified Complaint illustrates, Mr. Yarborough views SDP's interests as interchangeable with his own. *Compare* (Dist. Ct. Doc. 1-1 at PageID# 173, ¶¶ 6–7), *with* (*id.* at PageID# 174, ¶ 13). SDP, then, is subject to the QSL II Agreement's arbitration provision both as (1) an indirect member of QSL II and (2) an entity which shares an agency relationship with Mr. Yarborough. (Dist. Ct. Doc. 4-2 at PageID#273–74, §§ 10.1, 10.1(vi)).

Appellees agree with this analysis. Days before filing this lawsuit, Mr. Yarborough, on behalf of himself and SDP, cited his status as (1) Co-Manager of QSL

II and (2) indirect member of QSL II via SDP's membership interest in QSL I to demand Ms. Belk submit to arbitration pursuant to the QSL II Agreement, despite being a non-signatory to the agreement. (Dist. Ct. Doc. 4-1 at PageID# 255). Appellees were well within their rights under the QSL II Agreement to do so.

The district court agrees, too: "The specific third-party provision in the QSL II Agreement may cover Yarborough and give him status as a third-party beneficiary[.]" (Dist. Ct. Doc. 23 at PageID# 841). So, what gives? Well, the district court further opined that "Yarbrough's [sic] claims in this case relate to the governance of QSL and in no way invoke any benefits delineated in the QSL II agreement." (*Id.*). That is incorrect.

Just days before filing this lawsuit, Mr. Yarborough invoked the QSL II Agreement's arbitration provision when it served an arbitration demand upon Ms. Belk. (Dist. Ct. Doc. 4-1). In it, Mr. Yarborough (among other claimants) alleged, in relevant part, as follows:

> **I. INTRODUCTION AND PARTIES**
>
> 1. *This is a demand for arbitration pursuant to the Operating Agreement of QSL II[.]*
> 2. All parties are direct or indirect members of [QSL II]. *Claimant Andy Yarborough is a Co-Manager of [QSL II] and, together with [Ms. Belk], is a 50% equity owner of* ***QSL [I]****, an Alabama limited liability company and [QSL II's] majority member.*

3. [Ms. Belk] is attempting to unilaterally alter the governance structure of [QSL II] by removing Mr. Yarborough as Co-Manager, *notwithstanding a present ongoing dispute over her authority to do so* and the existence of material conflicts of interest that disqualify her from acting in the best interests of [QSL II] or its members.

**II. NATURE OF THE DISPUTE**

4. The Claimants seek a Declaratory Judgment confirming that:
   A. Andy Yarborough is and remains a duly appointed and acting Co-Manager of [QSL II]; and
   B. [Ms. Belk]'s attempt to remove Mr. Yarborough as Co-Manager was unauthorized, invalid, and without legal effect.
5. The basis for this claim includes the following:
   *A. [Ms. Belk] acted unilaterally and purportedly on behalf of* ***QSL [I]****, the majority owner of [QSL II], in removing Mr. Yarborough as Co-Manager of [QSL II]. However, a current dispute exists between Belk and Yarborough concerning:*
      - *Whether Belk possesses authority to act unilaterally on behalf of* ***QSL [I]****; and*
      - *Whether Yarborough, as a 50% equity owner of* ***QSL [I]****, has the right to co-manage* ***QSL [I]*** *and thereby co-direct* ***QSL [I]'s*** *actions relating to [QSL II].*

(Dist. Ct. Doc. 4-1 at PageID# 255–56) (emphasis added).

That is, Appellees relied upon Mr. Yarborough's prior status as Co-Manager of QSL II and SDP's membership interest in QSL I to demand Ms. Belk submit to arbitration under the QSL II Agreement. And in so doing, Appellees squarely placed the issue of whether Mr. Yarborough "has the right to co-manage QSL [I] and

thereby co-direct QSL [I]'s actions relating to [QSL II]" before an arbitrator under the QSL II Agreement. (*Id.*).

What's more, Mr. Yarborough's statements provide clear evidence that he is bound by the arbitration provision in the QSL II Agreement. A party's pleading in a prior case is admissible in a subsequent action as an admission of the truth of the facts stated in the pleading if such pleading was filed on behalf of the party in another action and was drawn under the party's direction or with his knowledge of its content. *Yates v. Christian Benev. Funeral Homes, Inc.*, 356 So. 2d 135, 137 (Ala. 1978); *Whaley v. Lawing*, 352 So. 2d 1090, 1091 (Ala. 1977) ("As a general rule, the pleadings of a party in another action are admissible as admissions against interest where those pleadings were drawn under the party's direction or with his consent."); *see* (Dist. Ct. Doc. 22 at PageID# 730).

Nonetheless, the district court reasoned that Appellees did not "claim the benefits" of the QSL II Agreement within the meaning of the third-party beneficiary doctrine because they withdrew the QSL II arbitration demand before filing the instant action. (Dist. Ct. Doc. 23 at PageID# 841). That is both legally and factually incorrect.

As a matter of fact, Appellees did not dismiss the arbitration demand and thus repudiate the benefits of the QSL II Agreement. Instead, they opted to "withdraw[]" it "without prejudice . . . pending determination of the member deadlock." (Dist. Ct. Doc. 4-4 at PageID# 350). In other words, Appellees reserved their rights to pursue arbitration under the QSL II Agreement after it is determined whether a voting deadlock exists under the QSL I Agreement. Appellees did not communicate *any* intent to abandon the demand altogether and, thus, repudiate the benefits of the QSL II Agreement. (*Id.*).

And as a matter of law, Appellees' withdrawal of the arbitration demand does not function as a repudiation of the benefits of the QSL II Agreement. On the contrary, Appellees invoked the benefits of the agreement when they served the demand upon Ms. Belk and, at that time, ratified their consent to be bound by the QSL II Agreement. It does not matter that they did not see the demand through to completion. *See Georgia Power Co. v. Partin*, 727 So. 2d 2, 5 (Ala. 1998) ("The law is clear that a third party beneficiary is bound by the terms and conditions of the contract that it *attempts* to invoke.") (citation omitted; emphasis added).

In short, the QSL II Agreement bestows "a direct, as opposed to incidental benefit" upon Appellees, (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1(vi)), so Appellees are third-party beneficiaries under it, *Dunning*, 890 So. 2d at 97. And

because Appellees elected to accept the QSL II Agreement's benefits by serving an arbitration demand thereunder upon Ms. Belk, (Dist. Ct. Doc. 4-1), they cannot now avoid its burdens—"including those . . . burdens associated with arbitration." *Capitol Chevrolet & Imports, Inc. v. Grantham*, 784 So. 2d 285, 289 (Ala. 2000). As third-party beneficiaries, Appellees are bound to the QSL II Agreement's arbitration provision. *Dawson*, 57 So. 3d at 97; *Dunning*, 890 So. 2d at 97; *Locke*, 910 So. 2d at 1251. Accordingly, they should be compelled to arbitrate under the QSL II Agreement. *Various Insurers*, 131 F.4th at 1277.

**ii. Appellees are further equitably estopped by their prior reliance on the QSL II Agreement's arbitration provision.**

A "nonsignatory to a contract having an arbitration agreement will be treated as a third-party beneficiary of the contract regardless of whether the nonsignatory meets the legal definition of a third-party beneficiary 'when he or she asserts legal claims to enforce rights or obtain benefits that depend on the existence of the contract that contains the arbitration agreement.'" *MTA, Inc.*, 114 So. 3d at 31 (quoting *Custom Performance*, 57 So. 3d at 98); *Dellaccio v. Gov't Blvd. Motors, Inc.*, No. 15-cv-305-CG-N, 2015 WL 13721524, at *4 (S.D. Ala. July 8, 2015) ("Under the second exception [to the general rule that a non-signatory cannot be forced to arbitrate], nonsignatories can be equitably estopped from avoiding arbitration where

they assert legal claims to enforce rights that depend on the existence of that contract with the arbitration agreement."). This doctrine "is referred to as the equitable-estoppel exception because of the inequity that would result if a party were allowed to simultaneously claim the benefits of a contract while repudiating its burdens and conditions." *MTA, Inc.*, 114 So. 3d at 31. If Appellees are not third-party beneficiaries (though they are), equitable estoppel applies.

As discussed above, Appellees sought to "enforce rights that depend on the existence of" the QSL II Agreement, *i.e.*, invoking its arbitration provision to decide Mr. Yarborough's entitlement (or lack thereof) to "co-direct QSL [I]'s actions relating to [QSL II]." (Dist. Ct. Doc. 4-1). That is enough to trigger equitable estoppel. *Dellaccio*, 2015 WL 13721524, at *4.

Appellees seek to "simultaneously claim the benefits of a contract and repudiate its burdens and conditions." *Ard*, 772 So. 2d at 1134. They cannot: a non-signatory "is equitably estopped from avoiding arbitration . . . when he or she asserts legal claims to enforce rights or obtain benefits that depend on the existence of the contract that contains the arbitration agreement." *Custom Performance*, 57 So. 3d at 98. Appellees previously asserted a legal claim to enforce a right that depends upon the QSL II Agreement. (Dist. Ct. Doc. 4-1). That legal claim is the factual basis for the instant action. *Compare* (*id.*), *with* (Dist. Ct. Doc. 1-1 at PageID# 170–91).

Therefore, Appellees are equitably estopped from now avoiding arbitration of the same dispute under the QSL II Agreement.

*  *  *

For all these reasons, this Court should vacate the district court's order denying Appellants' motion to compel arbitration.

## II. The district court erred when it granted Appellees' motion for specific performance and compelled arbitration under the QSL I Agreement.

The district court erred not only in its consideration of Appellants' motion to compel arbitration, but also in its consideration of Appellees' motion for specific performance. One of these errors is predicated on the district court's erroneous denial of Appellants' motion to compel arbitration. *See* § II(a) below. The remaining errors are harmless *unless* Appellants' motion to compel was rightfully denied (meaning questions of substantive arbitrability were properly for the court to decide), in which case the errors are harmful. *See* §§ II(b), (c) below.

### a. The district court erred when it construed the scope of the QSL I Agreement's arbitration provision, an issue of substantive arbitrability reserved for decision by an arbitrator under the QSL II Agreement's delegation clause.

For the reasons set forth in detail above, the QSL II Agreement contains an arbitration provision and delegation clause, both of which bind Appellees by function

of state law (either as a matter of law under *Wiggins* and *Anderton*, or under the equitable doctrines of third-party beneficiary or equitable estoppel). Consequently, the scope of the QSL I Agreement is a question of substantive arbitrability to be resolved by an arbitrator pursuant to the QSL II Agreement's delegation clause. *Wiggins*, 307 So. 3d at 522; *JPay*, 904 F.3d at 937. However, because the district court rejected Alabama law to find that the QSL II Agreement does not bind Appellees, it incorrectly proceeded to assess questions of substantive arbitrability under the QSL I Agreement. (Dist. Ct. Doc. 23 at PageID# 843–44). This was error.

For reasons stated earlier, the QSL II Agreement controls, and that agreement requires questions of substantive arbitrability to be resolved by arbitration. (Dist. Ct. Doc. 4-2 at PageID# 273, § 10.1). This Court should, therefore, vacate the district court's orders (1) denying Appellants' motion to compel arbitration and (2) granting Appellees' motion for specific performance and remand with directions for the district court to enter an order to compel arbitration under the QSL II Agreement. *U.S. Nutraceuticals*, 769 F.3d at 1310 (11th Cir. 2014) (Pryor, J.) (reversing a district court's denial of a motion to compel arbitration because "the district court should have sent this dispute to arbitration for an arbitrator to decide the question of arbitrability").

**b. If the QSL II Agreement's delegation clause does not apply, the district court nonetheless erred when it construed the scope of the QSL I Agreement's arbitration provision to include disputes over whether a voting deadlock exists; that is a "gateway question" of substantive arbitrability subject to determination by a judge, not an arbitrable claim in and of itself.**

If the QSL II Agreement does not reach Appellees, Appellants concede that the district court was tasked with resolving questions of substantive arbitrability under the QSL I Agreement because it doesn't contain a delegation clause. Indeed, "[q]uestions of arbitrability, often described as 'gateway' questions, are higher-order questions" which are "presumptively for the courts" to decide. *JPay*, 904 F.3d at 929 (internal citation omitted). The hallmark of a gateway question is that its answer "determines the type of dispute that will be arbitrated." *Id.* at 927. Regrettably, the district court erred in its analysis of the scope of the QSL I Agreement's arbitration provision and, consequently, avoided deciding a "gateway question" of arbitrability, which it (inappropriately) sent to an arbitrator for decision.

When "contractual language is 'plain and free from ambiguity' . . . 'there is no room for construction, and it is the duty of the court to enforce it as written.'" *Vankineni v. Santa Rosa Beach Dev. Corp. II*, 57 So. 3d 760, 762 (Ala. 2010) (quoting

*Kinnon v. Univ. Underwriters Ins. Co.*, 418 So. 2d 887, 888 (Ala. 1982)). The QSL I Agreement's unambiguous arbitration provision reads, in its entirety, as follows:

> *In the event of a deadlock in the voting between the members*, *the members agree* that they shall each designate in writing the name of a person other than themselves who is not related to them by blood or marriage. These designated persons shall designate in writing the name of a third person whom they agree is impartial and trustworthy. Such selected third person shall serve as an arbitrator and shall decide in writing the issue regarding which there is a deadlock between the members. The members agree to be bound by the written decision of such selected person and agree that such decision shall be enforceable as a judgment in any court of competent jurisdiction.

(Dist. Ct. Doc. 1-1 at PageID# 31, § 13) (emphasis added).

The QSL I Agreement's plain language reveals but one meaning: The members "agree[ment]" to submit to the QSL I Agreement's arbitration provision only kicks in when there is "a deadlock in the voting between the members[.]" (*Id.*). Thus, the arbitration agreement does not provide for arbitration of the question of whether a voting deadlock exists; instead, the agreement to arbitrate is expressly limited to resolving a pre-existing voting deadlock. So, the district court erred in concluding that "a dispute involving a 'deadlock in the voting' falls within its scope." (Dist. Ct. Doc. 23 at PageID# 844).

Most importantly, however, without a voting deadlock, *there is no agreement to arbitrate*. (Dist. Ct. Doc. 1-1 at PageID# 31, § 13). The question of whether a voting deadlock exists is *not* itself an arbitrable question under the QSL I Agreement's arbitration provision; rather, that question is one of substantive arbitrability reserved for decision by a court, not an arbitrator.

Yet, the district court declined to decide this "gateway question." (Dist. Ct. Doc. 23 at PageID# 844–45). Instead, it offered its opinion on the question: "[N]o formal voting on the co-manager issue has occurred," but "it is not entirely clear whether the parties' dispute falls within the scope of the QSL [I] Agreement." (*Id.* at PageID# 845). It then resolved the doubt "in favor of arbitration." (*Id.*). That's abdication. The district court justified its abdication by construing the voting-deadlock requirement as a "procedural condition precedent." (Dist. Ct. Doc. 23 at PageID# 844–45). It is not one.

To be sure, an "arbitrator," not a judge, "shall decide whether a condition precedent to arbitrability has been fulfilled." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002). But this refers to questions of "procedural arbitrability," not "substantive arbitrability." *Id.* Examples of questions of procedural arbitrability include "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met[.]" *Id.*

(citation omitted). In other words, procedural conditions precedent "determine[] *when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all." *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 35 (2014) (emphasis in original). Such provisions, thus, function as "claims-processing rule[s] that govern[] when the arbitration may begin, but *not* whether it may occur or what its substantive outcome will be on the issues in dispute." *Id.* at 35–36.

The voting-deadlock requirement is not a "claims-processing rule"; rather, it establishes "whether there is a contractual duty to arbitrate at all." *Id.* at 35, 36. It is, therefore, not a "procedural condition precedent" as the district court suggests—but a substantive one concerning arbitrability. If there is no voting deadlock, then there is no *agreement* to arbitrate. It is as simple as that. So, in the absence of a delegation clause, this "higher order" question of arbitrability was for the district court to decide. Not an arbitrator. But the district court kicked the can.

**c. If the QSL II Agreement's delegation clause does not apply, on *de novo* review, this Court should find that no vote occurred and, thus, that no voting deadlock exists sufficient to compel arbitration under the QSL I Agreement**

Still assuming for the sake of argument that the QSL II Agreement does not reach Appellees, and thus that questions of substantive arbitrability are not delegated

to an arbitrator, this Court should find that no voting deadlock exists to compel arbitration under the QSL I Agreement.

Section 4.8 of the QSL I Agreement sets out "Member Quorum and Voting." For a vote to occur, a quorum must be present at a special meeting. (Dist. Ct. Doc. 1-1 at PageID# 23, § 4.8). Interpreting the QSL I Agreement as a whole, then, a voting deadlock can arise only after a vote occurs (or is attempted) at a special meeting. *See WM Mobile Bay Env't Ctr., Inc. v. City of Mobile Solid Waste Disposal Auth.*, No. 18-cv-429-KD-MU, 2020 WL 13539219, at *2 (S.D. Ala. Nov. 20, 2020) (explaining that a court must read an operating agreement as a whole).

Mr. Yarborough can call a special meeting to put the matter to a vote. (Dist. Ct. Doc. 1-1 at PageID# 15, § 4.2). Inexplicably, he has not done so. (Dist. Ct. Doc. 12-1 at PageID# 487, ¶¶ 49–51). Instead, Mr. Yarborough has repeatedly asked Ms. Belk whether she consents to his being named a Co-Manager.

Make no mistake, Mr. Yarborough's *post hoc* recharacterization of his efforts as seeking unanimous consent is a distinction without a difference as there still is no voting deadlock. (Dist. Ct. Doc. at PageID# 23, § 4.6) ("Any matter on which the Members are authorized to take under law or the Articles of Organization, may be taken by the Members without a meeting if written consents to such action are signed by Members owning one hundred (100%) of the Sharing Ratio Interests in the

Company, entitled to vote upon such action."). To date, Ms. Belk has not consented because Mr. Yarborough refuses to discuss Ms. Belk's concerns about his conflicts of interest. But more importantly, there has been no special meeting and no vote. To trigger a voting deadlock, Mr. Yarborough must call a special meeting to submit the issue to a vote, which he refuses to do.

It is unclear why Mr. Yarborough will not exercise his right to call a special meeting pursuant to Section 4.2 of the QSL I Agreement. But it cannot be genuinely disputed that he hasn't. *See* FED. R. CIV. P. 56(a). His inaction does not justify compelling this matter to arbitration under the QSL I Agreement (unless, of course, the QSL II Agreement applies and this question of arbitrability must be submitted to an arbitrator for decision). Only after a vote occurs, and results in a deadlock, can Mr. Yarborough invoke the QSL I Agreement's arbitration provision.

Accordingly, if the QSL II Agreement does not reach Appellees, this court should vacate the district court's order granting Appellees' motion for specific performance and remand with instructions for it to enter an order denying the motion with prejudice. After all, this Court "may conclude as a matter of law that parties did or did not enter into an arbitration agreement" in the absence of a "genuine dispute as to any material fact concerning the formation of such an agreement"—and it cannot genuinely be disputed that no vote occurred within the

meaning of the QSL I Agreement. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Or, at the very least, this Court should vacate the order and remand with instructions for the district court to decide whether a "voting deadlock" exists (again, assuming that the gateway question is not subject to arbitration under the QSL II Agreement).

## CONCLUSION

This Court should vacate the district court's orders (1) denying Appellants' motion to compel arbitration and (2) granting Appellees' motion for specific performance and, further, remand this action back to the district court with appropriate instructions—preferably directing the entry of an order compelling arbitration under the QSL II Agreement.

Dated: February 4, 2026

Respectfully submitted,
s/ Robert E. Ranney

Benjamin C. Fultz
Philip E. Cecil
Robert E. Ranney
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202
Phone: (502) 588-2000
Email: bfultz@fmdlegal.com
pcecil@fmdlegal.com
rranney@fmdlegal.com

- and -

Allen E. "Teeto" Graham
PHELPS DUNBAR LLP
101 Dauphin Street, Suite 1000
P.O. Box 2727
Mobile, Alabama 36652
Phone: (251) 441-8233
Email: teeto.graham@phelps.com

*Counsel for Defendants-Appellants*

## CERTIFICATES OF COMPLIANCE

This document complies with the word limit of FED. R. APP. P. 32(a)(7)(B) because this document contains 10,175 words, excluding parts of the document exempted by FED. R. APP. P. 32(f) and 11th Cir. R. 32-4.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief was prepared in a proportionally-spaced typeface, 14-point Equity A font.

s/ Robert E. Ranney
Robert E. Ranney
*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify on February 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s/ Robert E. Ranney
Robert E. Ranney
*Counsel for Defendants-Appellants*